Thank you. There are two questions primarily that the court has to answer in this case. The first question is whether Mr. Wan arguably proscribed from renting a home in the state of Texas because he is domiciled outside the United States. Under Texas law, Mr. Wan, who has a Title I visa, cannot be the recipient of in-state tuition at any public institution in the state precisely because he is not considered domiciled. In Texas, under Texas law and as explained in the Texas, if you look at the Texas University's list of the types of visas that permit the finding of domicile here, if you look at the Attorney General explaining the rule as regards to the prior statute, which follows the logic of the current statute, he cannot because under his F-1 visa, he has stated and agreed that when he is done with his studies, he needs to return to where he came from, from China. So let me ask you, I guess, sort of a predicate question. Is there anything in the record, any evidence that would support that he is currently or was even previously domiciled in China? Only that he is a citizen of China and comes from China, but if this is a question of evidence, this case was decided on a motion to dismiss. On our first motion to dismiss, this is a matter of sufficiency in the complaint. In the complaint. We can, it is easy to amend the complaint if it's a matter of him certifying, adding to his statement or including the specific visa, which I think might actually be in the record, but I'm not sure. I don't want to infer something's in the record that's not. That will say that he is from China, which is where he would have submitted his... So he's claiming, as an allegation, he's claiming that he is a citizen of China? Well, he's already in the record, both as a VERD and in his declaration, he is a citizen of China. So it doesn't really matter where he's domiciled, so long as it's not in the United States. If he was domiciled in China, he would be covered by the law. If he was domiciled in Belgium, he would be covered by the law. Does he intend to return to China? Intend is a... It really depends on the definition of what you mean by intend, because I think he hopes to remain in the United States. I think that's the language he used in his Vietnam declaration, but he has no pathway to do that, and he intends to follow his visa. His visa says that he will return when the purpose of the visa, the studies, has concluded. So in that sense, yes, he does intend to return to China. And he intends to live in China permanently? He intends to return to China. I don't really have any... There's nothing in the record as to where he'll plan on living, but he has stated in his visa that he intends to return, and he does not and cannot let the United States pass his studies unless he has ultimately or fortuitously has a separate grounds for a visa, which he doesn't have currently. If you could amend the complaint, what would the complaint allege to satisfy the domicile requirement? I think the complaint would allege that he is from China, that he has only lived in the United States and China, that he has sworn, I think some of this is in the complaint, to return where he came from, and to the extent that it specifically is China, and that he intends to comply with the terms of his F-1 visa. I think you can assume most of those facts there. Would he allege in this amended complaint, this hypothetically amended complaint, that his true, fixed, and permanent home is in China? I think that's a legal conclusion. I don't know without talking to him if he would use those words in a factual basis. Okay. What factual basis would he give that would allow me to make a legal conclusion that his true, fixed, permanent home is in China? I think that he would agree that once his visa is expired, he has no legal basis for staying in the United States, he would return to China. So was the declaration that he submitted under penalty of perjury a lie? No. Because that's not what it says. In fact, it says the exact opposite. It says that he intends to stay in the United States, finish his degree, and seek employment opportunities to become a pastor in the United States. I think it says he uses the word, hopes or wishes. I don't think it uses the word, intends. There's not a single word anywhere in here that says he intends to return to China and make China his fixed, permanent home. Okay. I think, again, that he intends to comply with the terms of the visa, if we have to be clear about that, while he would prefer to stay in the United States. Absent a pathway for doing that, I'm sorry, I don't know why I'm getting this feedback. Absent a pathway for doing that, I don't think there's anything he can do. Meanwhile, under paternal island, he doesn't even need to establish that he intends to violate the act, because paternal island says, and I'll quote, Tofurky need not establish that it only intends to violate the act, because the Supreme Court has stressed time and again, nothing in its decisions requires a plaintiff who wishes to challenge the constitutionality of the law to confess that he will, in fact, violate the law. What's only necessary, I'm no longer quoting, is that it's arguably prescribed that there is the potential that if he remains in the United States, that a prosecutor and fact finder will find that he is domiciled in China, and therefore sanction him under the law. Given that he has signed an F1 visa, his subjective intent, under Texas law, subjective intent is only one aspect of establishing a domicile. You need to show subjective and objective. But if a court disregards his subjective intent, which as I said before, is more of a desire than an intent, then he'll be found to be in violation of SB 17, because he has stated again in the F1 visa application that when the purpose of the F1 visa is expired, he will return. Does your client have a home address in China? Don't know the answer to that question. As far as you know, he doesn't have a home address in China. You have no basis for saying he has a home address in China. I have no basis of saying either way. So how could he have a fixed permanent home in China if he doesn't have a home address in China? Because he has to return to China. So when I went to the University of Michigan, undergrad, I was living in the state of Michigan. Michigan may have a different domicile than Texas. And for those four years, I was deemed to be domiciled in New York. You could say that I was domiciled at my parents' home address. I never planned on moving back home. That's why you go to college. You go to college to move out. And I never, in fact, did live in my parents' home address. And when I applied to the University of Michigan Law School, even though I'd been living in the state of Michigan for the past four years, I was still not domiciled in Michigan. And I did get offered admission to the University of Michigan Law School as an out-of-state resident. Does the F1 visa require him to return to China? Or does it require him to leave the United States? I believe it requires him to leave the United States. It has absolutely no requirement whatsoever that he could return to China. He could go to Berlin or Canada. But if he's domiciled in Berlin or Canada, he's still covered under the act. But your entire premise as to why he's domiciled in China is that his fixed permanent home and principal residence into which the individual returns to return whenever absent from the United States is in China. That has to be the point. I would say that my point is that he cannot deem himself domiciled in the United States, which is all that's necessary because he's a Chinese citizen to be covered under the act, because he's agreed to leave, and therefore he cannot establish the United States. Let me ask it this way, because I'm afraid we're talking past each other. When you're saying domiciled, I'm assuming that what you're talking about is what we learn in 1L CIPPRO concepts of domiciliary status. That is, you're domiciled in a place, you remain domiciled there until you establish a new domiciled place, and your domiciled status is in fact subjective because it does turn on your intent to either leave, or return, or stay. Yes? When you say the word domiciled, I'm assuming you mean our 1L CIPPRO class. I am using it as it's defined under the statute as having an individual's true fixed and permanent home and principal residence to which the individual intends to return whenever absent. I do agree with one thing you said in particular, which is that once a domicile is established, that is your domicile until you establish a new domicile. But that's not what this says. That's what Texas law says. I think that's in the government's own briefs, though they call it dated law. They admit that it hasn't been overturned. And since he came from China, moved to the United States, couldn't be domiciled in the United States. Where else would he be domiciled? So, yes or no, when you're using the word domiciled, you are referring to concepts that we learned in 1L CIPPRO. Is that what you mean? Or are you instead trying to tell me what the words in 5251 subsection 4 mean? I think they're relatively the same. You think they're the same? Yes. Even though this doesn't say anything about returning home or subjective intent or intent to stay? This uses the language from Snyder vs. Pitts, which is a 1955 Texas version of CIPPRO case. And so his true, fixed, permanent home and principal residence to which he intends to return whenever absent from the United States is a place that you don't know and is not in the record anywhere. It's in China somewhere, but we don't know. And we have no reason to believe it, both because he hasn't lived there, he doesn't in fact live there, he's never alleged that he returns to or intends to return there. The F1 visa status doesn't require him to go to China or any particular residence in China. I think you can be reasonably affirmed from the record that it is somewhere in China, but if it can't, we can amend the complaint. If you amended the complaint, would you give me an actual residential address? 101 Main Street, Shanghai? Likely. I haven't spoken with my clients, so I likely could give the last residential address that he lived in which, under Texas law, would be where his domicile would be unless changed. Again, I haven't spoken with my clients. In theory, my client might not know, but remember where the last person they lived. I don't want to promise something without a conversation with my client. Can we talk about Ex parte Young? Yes. The Attorney General says he's not going to enforce the statute against you. Why is that not the end of the case? So the rule under Ex parte Young, the rule under  Mi Familia Vota, is not whether the person intends to enforce it against our client, but whether the whether there's any willingness to enforce the statute at all. In the record, I think it's the 330s, the Attorney General states that he does plan on enforcing the statute, he does plan on putting forth procedures for prosecuting the statute. The fact that he won't prosecute it against our client is not the test, and it's not relevant. Would I have standing to challenge the statute under your theory? No. You would not have a chance. And why not? Because you're domiciled in the United States. There's nothing you could do for your conduct to be arguably prescribed under the law. So if I had been to China in the past, and I said that kind of thing, and said I was intending to return to China in the future, could I challenge it on the theory that yeah, it doesn't apply to me, but he says it doesn't apply against somebody, so therefore I have standing to challenge it. So I think there's a difference between whether the person has the authority to enforce the law. So, you know, I think you wouldn't have the law, you wouldn't have standing. Okay, so I'm not asking about standing. We're moving to Ex parte Young. So under your theory of Ex parte Young, assume I have standing. Just give me that for a minute. Can I say well, Attorney General Paxton has said he's going to enforce the statute against somebody. Now obviously he's not going to enforce it against me, but I should be able to, under Ex parte Young at least, sue the Attorney General to get a constitutional injunction against the statute. Yes, it sounds absurd, but that's because the problem is standing, not Ex parte Young. I want to move on to a credible threat. In order for there to be a credible threat, I only have two minutes, so I'll go really quickly and skip all the proceeds. If you look at La Union, which is one of the three cases the government cites, it's a statute about voter assistance and there's two types of laws. One of the laws involved the conduct of voter assistance, and there was no allegation that the organizations were going to violate those rules, and that's what the court said was a speculative chain of events that did not give rise to a credible threat. But even though Harris County said they did not enforce the law against these plaintiffs, the part of the law about paying voters, which the organizations intended to do, the court not only found a credible threat of prosecution, but it also said that redressability and traceability were easily met. I got through that faster than I thought. Any other questions? Okay, thank you, counsel. You have reserved five minutes for rebuttal, so we'll hear from you shortly. We'll hear from Mr. Mendelson at this time. May it please the court, to start off, Wayne is of course domiciled in the United States, not China. His complaint says that he has lived in the United States for 16 years. It says that he is pursuing a degree in the Dallas-Fort Worth area at record 66 and 67, which is his sworn declaration. He says that he hopes to have a job as a pastor at a local church. It says he wants to continue renting an apartment in the Dallas-Fort Worth area so that he can seek unemployment opportunities there. At record 85, which is his motion for a preliminary injunction, he says he has no real plans to return to China. Under any definition, he is domiciled in the United States, not in China. Now, I do want to be sure to address the point about the F-1 visa. We don't know from the complaint at what time he got the F-1 visa, but we know that it was at an unknown point in time in the past. So, the requirements for the F-1 visa are inconsistent with the sworn declaration that he provided to the district court. The only way those things can be read consistently, and we must because this is a 12b motion, we have to accept all the facts, and the complaint is true, is if he changed his mind. That's the only way that those statements can be shown to be consistent with each other, and so we have to rely on the facts before this court, which is that he says now, in a declaration that he plans to say in the Dallas-Fort Worth area indefinitely. So, no, he is not domiciled in China. He is, in fact, domiciled in the United States. I want to briefly also be sure to address the distinction between other Texas statutes like in-state tuition or a divorce venue statute in SB 17 right here. The distinction is that SB 17 is a statute that talks about five to seven categories of different types of foreigners and aliens. It talks about those unlawfully present, permanent residents, citizens, those that have a specific tie to a ruling political party, different types of ties to foreign countries, and it has at least five and two exceptions, so seven total. The problem, of course, the reason why that's not analogous for Mr. Wang to the other statutes is because the other statutes don't discuss foreigners. They don't discuss types of aliens, and so for that reason, applying the Expressio Oneus canon, it wouldn't be appropriate to just say, well, there's a visa type and a visa type is now a new category in which the statute applies. That's how the Expressio Oneus canon would work, but regardless, the facts just don't show us that he's domiciled in China. He is domiciled in the United States. I also want to be sure to talk a little bit about credible threat of enforcement and traceability in Ex parte Young because what's happening here is that Mr. Wang is doing everything he can to blow through Article 3 and sue a statute and seek a writ of erasure instead of actually establishing standing against the defendant that's before the court, and that, of course, is the Attorney General. Some of the arguments he made in his brief even suggest there's such a thing as a constitutional right to be in a federal court or have a pre-enforcement review suit in a court. That's, of course, not correct at all. Federal courts exist to resolve disputes between actual parties. He's trying to seek a hypothetical judgment, in our view. But let's start with the credible threat of enforcement point. And first, my friend on the other side was referencing the Turtle Island case, but that case applies the wrong standard. This court in the NPPA case held, and this was a very clear holding, that, quote, unlike in other constitutional contexts, in the speech context, we may assume a substantial threat of future enforcement. The court said the same thing in the Texas State LULAC case, referring to the same argument that Mr. Wang made in his brief in this case. It said, well, yes, plaintiffs argued that we must presume a credible threat of prosecution because it's a pre-enforcement challenge. Quote, they are mistaken. The presumption plaintiffs rely on applies to racially restrict expressive activity. And so that means that the court cannot assume a credible threat of enforcement. That means Mr. Wang has to plead facts or show some type of evidence of some type of a credible threat of enforcement. And we're not at all sure that he would be able to do that in a case where we told the district court three times that we're not going to enforce the statute against Mr. Wang. I also want to be sure to point out some of the differences in the various cases that we cited in our brief as to what's enough and to what's not enough. So the MPPA case, the national press case, said there's no standing to bring a due process claim, and that's because there's just no evidence that anyone had ever been arrested or prosecuted for violating that statute. In the Pueblo, Ontario case that my friend on the other side was referencing, it actually held that just being subject to a statute all by itself without anything else is not enough. And what this is doing is this is playing on the clarification, the distinction between Lujan and California v. Texas. Lujan, of course, said well, if you're the object of the regulation, then usually you have standing. And that's commonly true, of course. But Pueblo, Ontario was referencing the part of California v. Texas that said, well, that's actually not always enough. There's got to be some type of threat of actual enforcement, threatening enforcement. There's got to be some evidence like that. And the court really made this point very clear in the A&R engineering case. And that was a case just like this one, where there was a pre-enforcement statute, excuse me, a pre-enforcement challenge to a statute where the plaintiff sued the attorney general. And in that case, speaking about traceability, the court said the mere potential for enforcement is not enough. It said if there's no actual or threatened enforcement, if there's really nothing, then within the meaning of Clapper, the court has to reject standing as a chain of hypotheticals. And this is a really important point, because the court was referencing the Clapper case. And what I'm referencing now is footnote 4 of the Clapper case, which says it's never the government's burden to disprove standing. It's always, in fact, the plaintiff's burden to establish standing. And what footnote 4 of Clapper says is it's not the government's job to reveal the details about future hypothetical enforcement actions. That case is famously about surveillance. And so what it says is famed as hypothetical surveillance actions. But the logic, of course, of course, applies none the same. And so to dispose of this case, all the court has to do, it doesn't even have to address the domicile point. It can simply say in the absence of any type of domicile, this is the mere potential for enforcement under A&R engineering. And that's enough. And finally, I want to be sure to address the point about sovereign immunity and ex parte. And there's really no material distinction at all between this case and Mifamilia Voda v. Ogg. Mifamilia Voda v. Ogg actually rejects one of the exact arguments that Mr. Wang made in this case, and that is, he says, well, it's a new statute. Mifamilia Voda was brought six days after the governor signed the law in that case. And the court said, yes, you're right, it's a new statute, but there still has to be some affirmative conduct on the part of the state official. And here's the distinction between what the case that my friend on the other side was referencing, which is Healthy Vision, in this case. I'm referencing 5.255 of the property code. Those are the enforcement provisions of SB 17. The only mandatory authority in that section is it says the attorney general shall promulgate procedures to conduct an investigation. Ogg squarely held that an investigation is not compulsion or constraint within the meaning of ex parte young. That's why that argument falls apart. And in fact, although the statute says the attorney general shall make procedures, doesn't say anything about mandatory authority in terms of who he has to investigate. That's purely discretionary authority. But perhaps the most important point is the provision directly under that. This is, I believe, subsection C of 5.255. What that provision says is pure discretionary authority. It says the attorney general may bring a certain type of enforcement action to enforce this chapter. And so the distinction between Ogg and Healthy Vision is exactly that. Healthy Vision said, well, if there's truly mandatory language, then that's enough. Ogg said, well, but if it's about an investigation, then that's not compulsion or constraint. I also want to point out one inconsistency between Ogg and Healthy Vision. It's important to remember that Ogg is the first decided case and the control under the rule of order is. Ogg, like so many cases before it, said there's got to be some affirmative conduct on the part of the state official. It even says we focus on the conduct of the official. To the extent that Healthy Vision held that mandatory statutory language by itself is enough, that's inconsistent with the prior decided cases. And I think that's a really important point to bring up just in general because, of course, Ex Parte Young is based on the Kingswood Counselor Theory. It's based on this idea that there is a counselor who steps outside of the sovereign and he does something. But there can't be an Ex Parte Young exception to sovereign immunity, at least not in our view, if something of some type hasn't happened. The court's case would say, well, there's got to be some scintilla of affirmative action. So to the extent that Healthy Vision is inconsistent with that, in the earlier prior cases control, although the court doesn't even have to reach that issue to resolve this case at all. It can just say the only distinction here is that it's material, it's an investigation, and the rest of the statute, as I was mentioning, is pure discretionary authority. And so for those reasons, if the court has no further questions, we ask that the judgment be affirmed. All right. Thank you, Counsel. Mr. Sadowski, you've got five minutes of rebuttal time. Try and go quickly because I've got a lot. Start with National Press. National Press involved a 10-year-old statute that had never been enforced over 10 years in the way that the only claims in that was chilled speech and due process vagueness. The court said that in a statute that was now more abound, at least to the extent that it was interpreted that way, and it cites Berea, a case involving busker licenses, so another old, not new statute, that then we're not going to assume a credible threat of prosecution given the 10-year history. In A&R versus, in A&R engineering was a Ex parte Young case. That case turned not on the willingness of the Texas Attorney General to enforce the statute involving BDS voters that were required by the city of Houston in its contracts. It wasn't even a statute involving a prosecution plaintiff or any sort of prosecution plaintiff. The court, that turned on whether the Attorney General even, he explained, again, any ability to enforce the statute at all, and it was that inability to disclaim that A&R found noting that the requirement needed to be, of having authority to enforce the statute, needed to be specific, not general. Here, of course, the Attorney General has this specific authority to enforce the statute. In me familiar VOTA versus OB, the Houston District Attorney not only said that they would not enforce the statute, they were willing to enter into a stipulation in that case saying that they would never enforce the statute. That is a lot different from simply stating that either A, that they won't enforce the statute against this one client, or B, that they made no intent, no specific affirmative act to enforce the statute at all. If it was the second one that was the rule under Ex Parte I, then the Supreme Court's decision in Jackson versus Whole Woman's Health would have had to come out the other way, because in that case the medical board that controlled board licenses had never suggested in that case, up until that point, that it would enforce SBA against people who committed abortions, and in fact on remand the court certified that question to the Texas Supreme Court, where the board claimed it had no authority to enforce the statute. The Texas Supreme Court agreed, and at that point the case was made. Does the court have any further questions for me? Okay. Thank you, counsel. Thank you both. We appreciate your arguments here today. We'll take the case under submission. That concludes our oral argument docket for today. The court will stand in recess until 9 a.m. tomorrow morning.